**Clarence SEALS and Teresa Seals, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 87–10013–Civ.

United States District Court, S.D. Florida.

June 7, 1989.

Underwood, Gillis, Karcher, Valle, P.A., Miami, Fla. by David P. Karcher and John E. Bigler, Jr., Key West, Fla., and Horton, Perse & Ginsberg, Miami, Fla. by Edward A. Perse, for plaintiffs.

Leon B. Kellner, U.S. Atty., Miami, Fla. by Suzan Hill Ponzoli, for defendant.

## FINAL SUMMARY JUDGMENT

JAMES LAWRENCE KING, Chief Judge.

This case requires the court to determine the applicability of the Federal Tort Claims Act, 28 U.S.C. § 1346(b) ("FTCA") to an active Navy seaman injured on base while working off duty in a civilian capacity. Clarence Alden Seals was a naval seaman with the rank of AK2. While off duty, he worked at his Naval Air base for a civilian government contractor. While working in this capacity, he was injured purportedly as a result of the negligence of Navy personnel. He brings this action to recover for this injury, and his wife, Teresa Seals, brings derivative claims arising from this accident.

The government now moves for summary judgment pursuant to Fed.R.Civ.P. 56(c). The government maintains that both the Florida Worker's Compensation Statute, Fla.Stat.Ann. §§ 440.01–440.60 (West 1981), and the *Feres* doctrine, *see Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), bar Seals' FTCA action. The parties have stipulated to most material facts, and the plaintiffs do not contest other relevant factual matters. After considering the parties' positions during oral argument, the court grants the government's motion.

## STIPULATED FACTS

The Navy assigned AK2 Seals to the Naval Air Station in Key West, Florida. He worked in the aviation support division of the supply department. His job was to supervise receipt and delivery of aviation repairables and consumables. If a squadron needed an airline part, the squadron master would order the part through the supply department. When the new part came in, the squadron master would exchange the old part for the new one through the supply department. Seals was responsible for supervising the exchange of the old part for the new one. Seals' normal duty hours were from 7 a.m. to 4 p.m.

At 4 p.m., Seals would change out of his military uniform and proceed to his off-duty job with C.F.S. Air Cargo, Inc. ("CFS"). CFS is a civilian contractor that leases space directly on the Naval Air Station in Key West, Florida. CFS contracts with the Navy to load and off-load all military air cargo at the air station. CFS employees include both part-time military personnel and civilian full-time workers. CFS provides both union scale and worker's compensation benefits for its employees.

CFS' hiring of Seals did not meet all the formal Naval requirements governing employment of military personnel. The Navy performs safety and security checks upon CFS employees because of the hazardous and sensitive nature of the cargo transported. Nevertheless, Seals never filled out the required forms for off-duty employment. Seals maintains his immediate supervisor told him that written permission for his CFS job was unnecessary because of his supervisory capacity with the Navy. In addition, Seals employment schedule with CFS violated Navy policy. The Navy precludes CFS from hiring part-time military employees for a seven-day work week because the work is considered strenuous. Seals was not informed of this policy, and did not consider the work strenuous. At the time of his accident, Seals worked for CFS seven days a week.

Seals' seven-day schedule focused upon tasks in the afternoons and on weekends. On weekday afternoons between 4:30–6:30 p.m. Seals would proceed to load and off-load air cargo, most of which were the same repairables and consumables that Seals was responsible for in the supply department. On the weekends, Seals would work five hours on Saturday and another five hours on Sunday if a cargo plane needed unloading.

The accident occurred at approximately 6 p.m. on a holiday weekend, Friday, July 4, 1986. Although Seals was off duty and working for CFS at this time, he was still on "active" duty, subject to both military recall at any time and Naval discipline. Seals was not on leave, furlough or sick leave. This holiday weekend was not a duty weekend for Seals, for if the military needed personnel, the Navy would have called night-shift personnel before Seals.

The events leading to Seals' accident begin with Seals, his brother-in-law, and a full-time CFS employee driving to hangar VAQ33 on the Key West Naval Air Station. They were to deliver pallets of airplane supplies. When they arrived, no one was outside, but two duty guards inside instructed these CFS employees where to deliver the supplies.

To begin the unloading process, Seals needed to open the hangar doors. Although Seals' Naval duties brought him daily to hangar VAQ33, he never attempted to move the hangar doors prior to July 4, 1986. To open the doors, Seals placed his right hand between the doors. Almost simultaneously, two duty seamen closed the doors. Seals right hand was crushed between the closing doors.

Seals received medical treatment for his hand. Worker's compensation paid these medical bills. The government also paid for physical therapy after the medical treatment because Seals claimed his injury was service related.

In May 1987, the Navy placed Seals on the temporary disability retirement list (TDRL). He draws $292.00 biweekly in worker's compensation for total temporary disability.[1] In addition, because Seals' injury was service related, Seals also draws $744.00 a month from the Veterans Administration for temporary disability retirement. The Navy will reevaluate Seals periodically for his disability for a period of up to five years. At the end of that time, Seals either will be called back to active service, medically retired, or separated. Seals' other military benefits include medical care for himself and his family, use of the base exchange and commissary, limited financial assistance, and the other benefits normally afforded to servicemen retired for service-connected injuries.

## UNCONTESTED FACTS

The contract between CFS and the Navy required CFS to maintain worker's compensation insurance throughout the contract. The government compensates CFS for this insurance coverage.

## DISCUSSION

Seals sues the United States for negligence under the FTCA. Seals alleges that the Naval personnel negligently closed the hangar doors on his hand. Seals also claims that the Navy was negligent in its maintenance and design of the hangar doors, as well as by failing to properly instruct, train, and supervise operational personnel.

As a sovereign, the United States is immune to suit unless it waives its immunity. *Thomas v. Calavar Corporation*, 679 F.2d 416, 418 (5th Cir.1982). FTCA has established "a limited waiver of sovereign immunity, making the federal government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976). A federal court must strictly interpret and apply this waiver. *United States v. Sherwood*, 312 U.S. 584, 589–90, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941).

The government argues that the FTCA is inapplicable here for two reasons. Because a private party in a situation analogous to the government's here would be afforded the benefits of Florida's Worker's Compensation Statute, the government believes it should be afforded the same advantage. In addition, the government believes the *Feres* doctrine bars these FTCA claims. The court rejects the government's first argument, but finds that the *Feres* doctrine bars this FTCA action.

---

1. When Seals began working part time, these benefits were reduced.

## I. Florida's Worker's Compensation Statute Does Not Bar Seals' Claims.

■ Florida requires all qualified employers to provide worker compensation benefits for all their employees. Fla.Stat. Ann. § 440.10 (West 1981). The Florida Worker's Compensation Statute applies to two types of employers. Ordinary employers include the state and its political subdivisions as well as "every person carrying on any employment." Fla.Stat.Ann. § 440.02(4). Statutory employers are contractors who "sublet any part or parts, of contract work to a subcontractor." Fla. Stat.Ann. § 440.10(1). In the case of a statutory employer, the contractor must provide workers' compensation benefits for its employees as well as for the subcontractor's workers. *Id.*

A qualified employer's liability for work-related injuries is limited to providing workers' compensation benefits. Fla.Stat. Ann. § 440.11(1). This exclusivity applies to all claims arising from the injury, irrespective of whom may bring the action. *Id.* Within workers' compensation law, this limitation to one remedy is known as the exclusivity defense.

In Florida, employers can assert the exclusivity defense of Fla.Stat.Ann. § 440.11(1) only if the Worker's Compensation Statute mandates a duty to provide benefits. *See Jones v. Florida Power Corp.,* 72 So.2d 285, 287 (Fla.1954); *Conklin v. Cohen,* 287 So.2d 56, 59 (Fla.1973); *Smith v. Ussery,* 261 So.2d 164, 165 (Fla. 1972); *Moreno v. Universal Trusses, Inc.,* 416 So.2d 1221, 1222 (Fla. 3d DCA 1982). Florida only gives ordinary employers and statutory employers a duty to provide worker compensation benefits. *Richardson v. United States,* 577 F.2d 133, 135 (10th Cir.1978).

While readily conceding that the government is not an ordinary employer, the United States maintains that it is a statutory employer entitled to the exclusivity defense. The government believes its contract with CFS requires this court to characterize the United States as a "contractor" under the Florida Worker's Compensation Statute. As a statutorily-defined "con-tractor," the government maintains that it had a duty to provide worker compensation benefits for the employees of its "subcontractor," CFS.

The court disagrees. The government here acted in a manner consistent with being an "owner" rather than a "contractor." The mere fact that the government contracted with CFS directly, or had control over the actions of CFS employees, is not relevant. *Richardson,* 577 F.2d at 135. Fla.Stat.Ann. § 440.10 defines a contractor as one who itself has a contractual obligation that it passes on or sublets to the party with whom it contracts. *See Richardson,* 577 F.2d at 135 (citing *Jones v. Florida Power Corp.,* 72 So.2d at 289); *see also Cork v. Gable,* 340 So.2d 487, 489 (Fla.App.1977); *Conklin v. Cohen,* 287 So. 2d 56, 59 (Fla.1973); *Smith v. Ussery,* 261 So.2d 164, 165 (Fla.1972); *Street v. Safway Steel Scaffold Co.,* 148 So.2d 38, 42 (Fla. App.1962). In this case, the United States did not sublet a contractual duty. The United States itself was not under a contractual obligation to load and unload military air cargo. The government, therefore, cannot be a "contractor" within the meaning of Fla.Stat.Ann. § 440.10(1). The government acted as an owner would in retaining an independent contractor, a situation to which the exclusivity defense of Fla.Stat.Ann. § 440.11(1) is inapplicable. *Richardson,* 577 F.2d at 136. The government's payment of CFS' worker's compensation benefits was "commendable," but is insufficient to invoke the exclusivity defense. *Jones,* 72 So.2d at 287.

In this respect, this action differs from the decisions in *Roelofs v. United States,* 501 F.2d 87 (5th Cir.1974), *cert. denied,* 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47 (1975) and *Thomas v. Calavar Corp.,* 679 F.2d 416 (5th Cir.1982). These courts found similar government actions to fall within the "statutory employer" definition of the Louisiana Worker's Compensation Law, La. Rev.Stat.Ann. §§ 23:1032, 23:1061 (West 1984). These decisions were correct, for Louisiana's worker's compensation laws are broader than those in Florida. *See Richardson,* 577 F.2d at 136–137. Louisi-

ana includes as a statutory employer a principal who contracts with a party to perform a task that is part of the principal's trade, business or occupation. *Richardson*, 577 F.2d at 136. Florida does not have a similar provision. Accordingly, while the government would be a statutory employer in Louisiana, it is not in Florida. *See Whitney v. United States*, 451 F.Supp. 669, 670 (N.D.Fla.1978) (noting this difference). The exclusivity defense of Fla.Stat. Ann. § 440.11(1) is not available to the government.

## II. The *Feres* Doctrine Is Applicable Here.

■ On the otherhand, the *Feres* doctrine bars Seals' claims. The *Feres* doctrine precludes FTCA claims brought for injury to a member of the armed forces whose activity at the time of the injury is "incident to military service." *Flowers v. United States*, 764 F.2d 759, 760 (11th Cir. 1985) (citing *United States v. Brown*, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954); *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *Brooks v. United States*, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949)). The reasoning behind this doctrine is the preservation of the "peculiar and special relationship of a soldier to his superiors" and the need to avoid the negative effects of civilian suits on military discipline. *United States v. Shearer*, 473 U.S. 52, 105 S.Ct. 3039, 3043, 87 L.Ed.2d 38 (1985).

■ To determine the applicability of the *Feres* doctrine, a court conducts a two-prong inquiry. *Pierce v. United States*, 813 F.2d 349, 352–354 (11th Cir.1987). First, the court should examine the facts to ascertain whether the service person was acting "incident to military service." *Id.* at 352–353 (referring to *Parker v. United States*, 611 F.2d 1007 (5th Cir.1980)). Second, the court should determine whether the maintenance of the FTCA action will have an adverse impact on military discipline. *Pierce*, 813 F.2d at 354 (relying upon *Shearer*, 473 U.S. 52, 105 S.Ct. 3039).

■ In *Parker v. United States*, 611 F.2d 1007 (5th Cir.1980), the Fifth Circuit developed the proper factual analysis to determine whether the service person was engaged in an activity "incident to military service." A court must focus upon three factors which must be weighed in light of the totality of the circumstances. *Parker*, 611 F.2d at 1013–1015. These factors are (1) the duty status of the service member; (2) the place where the injury occurred, and (3) the activity the serviceman was engaged in at the time of the injury. *Id.* In examining facts pursuant to these considerations, the court must adhere to the doctrine of *stare decisis*. *Flowers*, 764 F.2d at 761.

■ In determining duty status, the court essentially faces two extremes, with the vast majority of situations falling somewhere in between. If an individual has been discharged from the service, his activities are not normally "incident to service." *Parker*, 611 F.2d at 1013 (citing *United States v. Brown*, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954); *Watt v. United States*, 246 F.Supp. 386 (E.D.N.Y.1965)). On the other hand, a serviceman who is on active duty is acting "incident to service." *Parker*, 611 F.2d at 1013 (citing *Beaucoudray v. United States*, 490 F.2d 86 (5th Cir. 1974)). "Between these extremes are degrees of active duty status ranging from furlough or leave to mere release from the day's chores." *Parker*, 611 F.2d at 1013. A serviceman on furlough or leave normally has an FTCA action. *See Brooks v. United States*, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949); *but see Uptegrove v. United States*, 600 F.2d 1248 (9th Cir.1979). On the other hand, a serviceman with an unexercised right to a pass or who is only off-duty for the day usually is held to be acting "incident to service." *Chambers v. United States*, 357 F.2d 224 (8th Cir.1966); *Zoula v. United States*, 217 F.2d 81 (5th Cir.1954).

■ The court finds Seals' duty status to be one closer to the "mere release from the day's chores" than furlough or leave.[2]

---

**2.** The United States Attorney argued that Seals' "active" duty status bars his claim. In the bind-

ing Fifth Circuit case of *Parker*, however, Judge

Seals was not on leave or furlough.[3] Unlike the facts in *Parker*, Seals did not request or receive the right to be absent from his regular duties. *Parker*, 611 F.2d at 1013–14; *see also Pierce v. United States*, 813 F.2d at 353. He was merely off duty for the holiday weekend, performing his normal civilian job at the same naval hangar where he conducts his assigned military tasks. These facts fall closely in line with those in *Mason v. United States*, 568 F.2d 1135 (5th Cir.1978) (serviceman relieved from his routine naval duties and was tending to personal business on his way home), *Warner v. United States*, 720 F.2d 837, 838–839 (5th Cir.1983) (serviceman with an afternoon pass) and *Watkins v. United States*, 462 F.Supp. 980 (S.D.Ga. 1977), *aff'd*, 587 F.2d 279 (5th Cir.1979) (serviceman injured after returning from Army softball practice), which all factored in the "active" duty status of the serviceman in finding *Feres* applicable.[4]

The second factor that a court examines is the location of the accident. "If the injury occurs on the base, it is more likely that the injured service member was engaged in activity incident to service." *Parker*, 611 F.2d at 1014. The inquiry, however, should not stop there, for an "on-the-reservation injury does not immediately trigger application of *Feres*." *Id.* (noting in subsequent paragraph several cases that found *Feres* inapplicable even though the injuries occurred on the military reservation).

With this in mind, the court notes that Seals' injury occurred on base, in a Naval hangar of which he had more than a passing familiarity. He and his CFS co-workers were to unload air cargo supplies, which Seals possibly would categorize later as part of his military tasks. Seals was injured in the specific place where he performed his assigned military job. Moreover, Seals was injured during a job he performed seven days a week. The location of Seals' injury is notably different from that in *Parker*, where the service member was merely "passing through the base on his way home." *Parker*, 611 F.2d at 1014.

The final fact this court must consider is the type of activity the serviceman was performing when the injury occurred. Specifically, the court should focus upon whether the service member was subject to military control; whether he or she was under the compulsion of military orders, and whether the service person was performing a military mission. *See Parker*, 611 F.2d 1014; *see also Warner*, 720 F.2d at 839 (noting the court's emphasis of these factors in *Parker*).

Seals was performing an activity incident to his military service. He was subject to military discipline. He also was subject to military orders, for two military duty officers informed Seals and his coworkers where to place the air cargo. Seals also performed a quasi-military mission, for he was opening the hangar door to unload military supplies. Seals' activity that gave rise to his injury was not personal or recreational.

When examining the totality of these circumstances, the court finds that Seals was injured while engaging in an activity incident to his military service. Seals was not on leave or furlough, had further business on the base, and was performing a quasi-military activity somewhat related to his military tasks. The *Parker* court found that a controlling distinction among *Feres* cases can be drawn between accidents in-

Fay found the "active duty" argument to be "unpersuasive." *Parker*, 611 F.2d at 1014 n. 10.

**3.** Apparently, Seals would be considered similar to a serviceman who had a pass. "Off-duty" service members who need not report until the next day technically have the same status as members on "pass." *Parker*, 611 F.2d 1013 n. 9 (citing cases).

**4.** Apparently, because Seals acted in a mere "off-duty" capacity, his duty status alone could

be sufficient to find that he was acting incident to service. *cf. Parker*, 611 F.2d at 1014 (noting that other two factual factors need only be explored if service member's duty status warrants the action). The court will explore the other factors here because *Parker* spoke of a review of the totality of the circumstances, especially, as is only slightly the case here, where the service member's duty status falls within a "grey" area. *Id.*

volving activities arising from life on the military reservation, which fall within *Feres,* and those in which presence on the base has little to do with the soldier's military service, to which *Feres* is inapplicable. *Parker,* 611 F.2d at 1015. Under the circumstances here, Seals worked with CFS in a quasi-military capacity every day of the week when he was off-duty. Seals' injury, therefore, arose from activities from life on the military reservation. Seals, therefore, was injured performing an activity incident to his military service.

This conclusion is similar to the finding the Eighth Circuit reached in *Miller v. United States,* 643 F.2d 481 (8th Cir.1980). In *Miller,* the serviceperson was a private in the United States Army. *Id.* at 482. After completing his normal military duties, and with the knowledge and permission of his superior officer, the serviceman reported to his part-time job that he held in a civilian capacity. *Id.* This civilian job required the serviceman to erect scaffolds on government-owned family quarters. *Id.* While building the scaffolding, the serviceman was electrocuted when an aluminum ladder he was holding contacted with a power line. *Id.* The Eighth Circuit held that the serviceman was injured while acting incident to his military service. *Id.* at 494. The court noted that the soldier's active duty status, combined with the fact that he was injured on his assigned base and that the work he was performing was related to the military mission of the base, connoted military service. *Id.* at 494.

The second prong of the analysis requires the court to examine the effects the maintenance of this FTCA action may have on the military discipline structure. *Pierce,* 813 F.2d at 354. The court must ascertain whether military officers would have "to testify as to each other's decisions and actions," or will the court have to "second guess military orders." *Id.* (citing *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 673, 97 S.Ct. 2054, 2059, 52 L.Ed.2d 665 (1977)).

Seals claim does pose a limited threat to the military discipline structure. If the action goes to trial, the court, *inter alia,*

would have to consider the propriety of allowing Seals to work part time in this civilian capacity, as well as the correctness of the duty officers' instructions to Seals. The court, therefore, would have to second guess "professional military judgments" over the supervision and control of Seals and the other servicemen. *See generally Pierce,* 813 F.2d at 354 (noting these military judgments are afforded the protection of *Feres* ).

Because Seals was injured performing an activity incident to his military service, and because the maintenance of this FTCA action would involve a court questioning the military discipline structure, the *Feres* doctrine bars this action. The court, therefore,

ORDERS and ADJUDGES that the government's motion for summary judgment is GRANTED.